# THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FACEBOOK ID https://www.facebook.com/100010443374129 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK. | Case No. (UNDER SEAL) |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jason R. Carter, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched for is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID "https://www.facebook.com/100010443374129."

2. I have been a sworn law enforcement officer for over six years. I have been assigned as a TFO with the DEA's Springfield, Missouri, Resident Office for approximately one year, four months. I have received specialized training relating to the manufacture, distribution,

and possession with intent to distribute controlled substances. Based upon my training and experience, I have extensive knowledge of complex illegal drug manufacturing and distribution operations.

3. As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4. The statements in this affidavit are based on my personal observations, my training and experience, my investigation of this matter, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth the facts that I believe necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (possession with the intent to distribute narcotics or distribution of narcotics, use of a communication facility, and conspiracy to distribute narcotics) are currently located at Facebook.com.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, have been committed by John G. MARTINEZ. There is also probable cause to search the information described in Attachment A for evidence of those crimes, contraband or fruits of those crimes, and instrumentalities as described in Attachment B.

## **PROBABLE CAUSE**

*Facts of Investigation*

6. Through my investigation, MARTINEZ of Sacramento, California, has been identified as the source of supply for multiple pound shipments of methamphetamine to Southwest

Missouri, who uses his Facebook account, which has the profile name of "Arch Angel," and can be found at https://www.facebook.com/100010443374129, to communicate about the distribution of methamphetamine.

7. The investigation into MARTINEZ's activities began on October 4, 2016, when the Missouri State Highway Patrol (MSHP) Troop D Special Weapons and Tactics executed a state search warrant at 411 South Highland Street, Purcell, Jasper County, Missouri, based on information received from a confidential informant.

8. The residence belonged to Christopher THOMPSON. THOMPSON stated that he used methamphetamine on a weekly basis and Daryl WESTON, who also resided at the search warrant location, supplied THOMPSON with the methamphetamine. THOMPSON denied any further involvement in the distribution of methamphetamine.

9. THOMPSON's cellular telephone was examined and on it were two photos of United States Postal Service (USPS) Priority Mail Express labels, each with the same recipient address in California. MSHP Sergeant James Musche contacted United States Postal Inspection Service (USPIS) Inspector Matt Murrow and made him aware of the investigation and the Priority Mail packages.

10. Before being contacted by Sergeant Musche on October 4, 2016, on October 3, 2016, Inspector Murrow had been contacted by Purcell, Missouri, USPS employees regarding a suspicious package with tracking number ending in 1664 (the same tracking number depicted in one of the photographs found on THOMPSON's telephone during the search warrant). The USPS employees reported that the man who mailed the parcel had not put a return address on the parcel, but only a name. The employees recognized the man and knew that the name he put on the return address, "Randy Sigers," was not the sender's name. The USPS employees also recognized the

recipient address on the package as the same address on a different package sent by another individual previously. The man mailing the current packages told the USPS employees the package contained "welding rods."

11. Inspector Murrow contacted a representative at the Sacramento, California, Post Office and requested that the package with tracking number ending in 1664 be intercepted and returned to Springfield, Missouri. Inspector Murrow received the package on October 5, 2016.

12. Later, Inspector Murrow was contacted by an employee of the Sacramento Post Office who advised him that someone identifying himself as "John Martinez" had called to ask about the package and left his phone number. Inspector Murrow called the phone number, but no one answered, so he left a message.

13. On October 7, 2016, MARTINEZ called Inspector Murrow and told him that the package contained money for a truck that had been purchased from him by a man in Missouri. MARTINEZ told Inspector Murrow that the man already had the truck. Inspector Murrow asked if the man's name was Randy Sigers. MARTINEZ said that he did not know anyone named Sigers and gave Inspector Murrow permission to search the package. Inspector Murrow opened the package and found $8,980 in United States currency packaged in two bundles of folded bills, wrapped in black paper, and concealed inside a plastic container with welding rods.

14. Several minutes after the call with MARTINEZ ended, MARTINEZ called back and explained that he was a confidential informant (CI) for an investigator in California. MARTINEZ stated he was not worried about the money, but he needed the individuals in Missouri to go to California because they were supposed to bring a load of firearms. MARTINEZ said that because Inspector Murrow had seized the money, the individuals were too scared to take the guns to California. Inspector Murrow told MARTINEZ to have the investigator he was working for in

California call him. The investigator never called Inspector Murrow. In November of 2016, Sergeant Musche confirmed that MARTINEZ was working as a CI for a local drug task force out of Yolo County, California. Sergeant Musche told the contact in Yolo County about his investigation in Missouri, and the contact there did not advise Sergeant Musche that MARTINEZ's work as a CI involved him sending methamphetamine to Missouri.

15. On December 30, 2016, Sergeant Musche arrested Carrie PENATE pursuant to a felony warrant for possession of a controlled substance. In a post-arrest, post-*Miranda* interview, PENATE told Sergeant Musche that she knew MARTINEZ and grew up with him in California. According to PENATE, about a year earlier, MARTINEZ had contacted her and her friend Kiley CARPENTER on Facebook. MARTINEZ wanted to meet CARPENTER, so in July of 2016, PENATE and CARPENTER traveled to California with Joel BELL, Lee WILLIAMS, and Katie BRUMMETT. After they returned from California, CARPENTER told PENATE that BELL was receiving methamphetamine from MARTINEZ in the mail and sending cash back to him.

16. On January 12, 2017, Sergeant Musche obtained a search warrant for a suspect package being shipped from West Sacramento, California, to Ashley Blair, 603 Cherry Street, Carl Junction, Missouri. Based on the ongoing investigation, Sergeant Musche believed MARTINEZ had shipped the package, and upon opening the package, Sergeant Musche found approximately eight (8) ounces of methamphetamine. A small bag containing a representative sample of the methamphetamine was left in the package and the package was released to Ozark Drug Enforcement Taskforce (ODET) Taskforce Officer (TFO) Chad Allison for a controlled delivery to 603 Cherry Street.

17. Later that day, TFO Allison approached the front door of 603 Cherry Street and knocked on the door. The door was opened by a white female, later identified as Jessica PALMER.

TFO Allison asked PALMER if she was Ashley Blair, and she stated she was. TFO Allison requested PALMER sign a FedEx package receipt form and she did so. PALMER took custody of the box that contained a representative sample of methamphetamine and went back inside the trailer. A few moments later, a search warrant was served on the residence and PALMER was arrested.

18. During a post-arrest interview, PALMER stated she signed Ashley Blair's name on the package receipt form and that Blair was not involved, but that she paid Blair for letting her use her house to receive the package. PALMER told investigators the methamphetamine was supplied by MARTINEZ. PALMER had never met MARTINEZ and did not know if that was his real name.

19. PALMER stated that over the past few weeks she received three packages containing methamphetamine, including the one from earlier that day. The two previous packages MARTINEZ sent to PALMER each contained four ounces of methamphetamine, and PALMER had sold and/or used all the methamphetamine that she had received.

20. PALMER said that MARTINEZ had originally contacted her via Facebook Messenger, but she did not know how MARTINEZ got her name. PALMER recalled Martinez's Facebook profile had the name "Angel" in it. MARTINEZ told her that he would send her methamphetamine if PALMER would send him money, but PALMER had to send half of the money up front before MARTINEZ sent the first package. MARTINEZ would send PALMER the tracking number for the packages he was sending.

21. PALMER also paid money or methamphetamine to friends of hers whom she recruited to send money to MARTINEZ. PALMER had people send MoneyGrams from Wal-

Mart or go to a credit union to deposit money into MARTINEZ's account. PALMER said she had been to the credit union a couple times and had taken people there to deposit money.

22. On February 28, 2017, Sergeant Musche interviewed Craig WHITTINGTON at the Jasper County Jail in Carthage, Missouri. WHITTINGTON explained he was involved in the distribution of large quantities of methamphetamine with BELL. Whittington claimed to be BELL's number one distributor in the Joplin, Missouri, area. The source of supply for the methamphetamine was "Arch Angel" also known as "Gabe" MARTINEZ from Sacramento, California. WHITTINGTON explained that BELL had traveled to Sacramento in the summer of 2016, with PENATE, CARPENTER, and BRUMMETT, to meet MARTINEZ. After the trip, BELL started receiving methamphetamine via FedEx shipments from MARTINEZ.

23. WHITTINGTON said that WESTON, who lived at the home where the October 2016 search warrant was executed, had jumped in front of BELL in the distribution chain sometime in the latter part of 2016, and BELL and WHITTINGTON started distributing methamphetamine for WESTON. WHITTINGTON claimed that WESTON was receiving multiple pound shipments from MARTINEZ on a weekly basis.

24. BELL and PALMER were arrested in November of 2016, in Kansas. After that, WHITTINGTON received two packages directly from MARTINEZ. WHITTINGTON stated MARTINEZ contacted him via Facebook Messenger. The first package contained one pound of methamphetamine. The second package contained eight ounces of methamphetamine. WHITTINGTON said he paid MARTINEZ $7,000 in United States currency for the pound package and never paid MARTINEZ for the eight ounces.

25. WHITTINGTON said he has twice sent money to MARTINEZ. The first payment was a deposit at the Joplin Metro Credit Union. MARTINEZ sent WHITTINGTON the credit

union account number via Facebook or text message. The second payment was made at Wal-Mart via MoneyGram.

26. Records previously obtained from Joplin Metro Credit Union confirmed that BELL, THOMPSON, and Alexander WHITTINGTON, who WHITTINGTON said was his brother, had all made deposits at the Joplin Metro Credit Union into a "shared branch" Golden I Credit Union account owned by MARTINEZ. The records showed specifically that on December 15, 2015, Alexander WHITTINGTON deposited $500 in cash into MARTINEZ's account. Records obtained from MoneyGram showed that WHITTINGTON had sent $500 on December 20, 2016, to Catherine ANGELES, whose name also appeared in messages from PALMER about paying MARTINEZ when investigators viewed PALMER's phone after her arrest in January of 2017.

27. WHITTINGTON provided Sergeant Musche with his Facebook passwords and gave Sergeant Musche consent to look at the messages sent from MARTINEZ. WHITTINGTON told Sergeant Musche that MARTINEZ's Facebook profile name was "Arch Angel."

28. Sergeant Musche logged on to WHITTINGTON's Facebook account and reviewed Facebook Messenger text files and audio files from MARTINEZ using the Facebook profile name of "Arch Angel," at https://www.facebook.com/100010443374129.

29. The messages show that between January 3, 2017, and January 17, 2017, WHITTINGTON and MARTINEZ had a conversation regarding WHITTINGTON owing money to MARTINEZ. The messages indicated that WHITTINGTON had trouble paying, and MARTINEZ at one point threatened WHITTINGTON's family. MARTINEZ wrote that he was going to "call Columbia," and told WHITTINGTON to do his homework about a "Colombian

necktie." In the messages, WHITTINGTON wrote he had already sent $1,000, which was consistent with the credit union and MoneyGram records.

*Facebook Functions*

30. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

31. In my experience, criminals utilize Facebook to communicate and to facilitate drug transactions. This is primarily because Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature, also called Facebook Messenger, that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

32. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and

zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

33. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their

Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36. Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them. Facebook also maintains available metadata related to photographs posted on its website. Metadata related to a photograph may be written into a digital photo file and will identify who owns it, copyright, and contact information, what brand or model of camera created the file, along with exposure information and descriptive information about the photo.

37. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

38. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

39. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

40. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

41. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

42. The Facebook gifts feature also allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

43. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

44. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

45. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; newsfeed information; status updates; links to videos, photographs, articles, and other items; notes; wall postings; friend lists, which can include the

user's friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48. Therefore, the computers of Facebook will contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

50. Based on the forgoing, I believe probable cause exists to search MARTINEZ's Facebook account for communications involving illegal drug activity, and I respectfully request that the Court issue the proposed search warrant.

51. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3). 18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is located in the Western District of Missouri and is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

52. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

_____
Jason R. Carter
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn before me this 14th day of March, 2017.

_____
David P. Rush
United States Magistrate Judge
Western District of Missouri

## ATTACHMENT A

This warrant applies to information associated with the Facebook user ID "https://www.facebook.com/100010443374129" that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

**I.  Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

> (a) All contact and personal identifying information, including "https://www.facebook.com/100010443374129": full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;
>
> (b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;
>
> (c) All photos and videos uploaded by that user ID, including associated metadata, and all photos and videos uploaded by any user that have that user tagged in them, including associated metadata;
>
> (d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend

2

lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook WebPages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

3

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846; involving John G. Martinez since December 30, 2015, for the user ID identified on Attachment A, information pertaining to the following matters:

(a) The sale and distribution of controlled substances;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person or persons who created or used the user ID, including records that help reveal the whereabouts of such person or persons; and

(e) Records relating to who created, used, or communicated with the user ID about matters relating to the distribution of controlled substances, including records about their identities and whereabouts.